# Exhibit A

# U.S. DEPARTMENT OF STATE
DIPLOMACY IN ACTION

Home » Under Secretary for Democracy and Global Affairs » Bureau of Democracy, Human Rights, and Labor » Releases » Human Rights Reports » 2010 Country Reports on Human Rights Practices » Western Hemisphere » Bolivia

## 2010 Human Rights Report: Bolivia

BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR
**2010 Country Reports on Human Rights Practices**
Report
**April 8, 2011**

Subscribe to Updates

Bolivia is a constitutional, multiparty democracy with a population of approximately 9.7 million. In December 2009 in a process deemed free and fair by international observers, citizens reelected Evo Morales Ayma, leader of the Movement Toward Socialism (MAS) party, as president. Security forces reported to civilian authorities.

The principal human rights problems reported were killings and torture by security forces; harsh prison conditions; allegations of arbitrary arrest and detention; an ineffective, overburdened, and corrupt judiciary; a "partly free" media; corruption and a lack of transparency in the government; trafficking in persons; child labor; forced or coerced labor; and harsh working conditions in the mining sector.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

The government or its agents did not commit any politically motivated killings; however, in May police killed two youths during violent protests, and in July a man was killed while in police custody.

On May 8, Bolivian National Police (BNP) officers killed two youths, Fidel Jimenez and Mario Hernani, during a conflict in the La Paz departmental town of Caranavi. Reports by the government's ombudsperson, the United Nations High Commission for Human Rights (UNHCHR), and the independent Permanent Assembly of Human Rights of Bolivia concluded that the deaths resulted from the use of excessive force; however, the parliament's Human Rights Committee concluded that the government responded properly.

On July 6, El Alto resident David Olorio Apaza allegedly was tortured and killed while in BNP custody. Police detained him for suspected robbery of a tollbooth. According to the report by the government's ombudsman, BNP Colonel Israel Vega ordered Olorio removed from his cell for questioning during which he was allegedly tortured and killed. The autopsy revealed his cause of death to be asphyxia due to compression of the neck and chest. The prosecutor's office investigation involving the actions of Vega and BNP officers Lieutenant Omar Antezana, Sergeant Juan de la Cruz, and Officers Juan Villa and Luis Aquino Mamani, was ongoing at year's end. According to media reports and a report by the ombudsman, the prosecutor in charge received threats surrounding the case, and the members of the judiciary involved in the case wore bulletproof jackets to a September hearing in response to threats. The ombudsman's report stated that the prosecutor should investigate the involvement of police at higher levels than those who were on trial and included proceedings against Prosecutor Veronica Angula Viscarra, who the ombudsman alleged made false statements to the public during the initial hearings.

Although the prosecutor has continued the investigation into the 2009 killing of three alleged terrorists in Santa Cruz, there have been no developments in the use of force by police during this event.

Mob violence, sometimes characterized by perpetrators as "indigenous justice" or "community justice," led to some violent deaths. Although the constitution discusses the concept of "indigenous justice," the government rejected the interpretation that it permits mob violence, noting that the constitution specifically bans capital punishment. Many observers attributed such "community justice" to the absence of effective police and judicial presence in many urban and rural areas. Killings committed in the name of community justice occurred during the year. While there were no official statistics for such crimes, the media reported approximately 15 cases of community justice that resulted in one or more deaths. According to

the UNHCHR, lynching increased, especially in El Alto and Santa Cruz.

On May 23, community members captured, reportedly tortured, and executed four police officers in the Potosi town of Uncia. The police officers, Nelson Alcocer Casano, Ruben Cruz Aruquipa, Esteban Alave Arias, and Miguel Ramos Palluni, were part of the BNP's Vehicle Robbery Prevention Unit. Community members claimed the police officers had a history of extorting bribes and killing those who could not pay. Government authorities and families of the slain police officers did not recover the bodies until after two weeks of negotiations with the community members. The government's ombudsperson criticized the government's slow reaction to the killings and unwillingness to order police to enter the community in force. Police arrested and detained community members Filomena Muruchi, Juan Coyo Rojas, Angel Coyo Aro, Eloy Janayo Choque, Anacleto Mendoza Aro, and Hilarion Escapa Gallego. Gallego was the only defendant to plead not guilty and requested termination of his detention, which was denied at a hearing on November 5. The investigation was ongoing at year's end.

On September 15, community members buried alive three brothers, Basil, Sabino, and Ignacio Flores, in the Cochabamba town of Tapacari. According to an ongoing investigation by Cochabamba Police Commander Hernan Trujillo, the brothers were killed following a border conflict among several farming communities that had left one farmer dead.

On September 11, witnesses began testifying in the ongoing investigation of the 2008 deaths of 13 persons in the cities of Porvenir and Cobija in Pando. A June 19 Amnesty International statement urged that the judiciary proceed with this case. On October 12, within the 18-month period allowed for investigation, prosecutors brought formal charges against former prefect (governor) Leopoldo Fernandez and other defendants for their alleged roles in the 2008 Pando conflict. Fernandez remained in detention while awaiting completion of the trial. During the court sessions, the lawyer for Fernandez stated that due process was violated. There were no other developments at year's end.

There were no developments in the prosecutor's investigation into the 2008 deaths of two miners during a confrontation with police in Cahuasi, near the border of Oruro and Cochabamba departments, or in the 2008 request by the Supreme Court to authorize an impeachment trial for members of the Ministry of Government, including former government minister Alfredo Rada, implicated in the 2007 killings of three persons in Sucre allegedly by security forces.

b. Disappearance

There were no reports of politically motivated disappearances.

On February 17, after a nine-month standoff, Armed Forces Commander in Chief General Ramiro de la Fuente denied a civilian investigator access to archives that reportedly contained information regarding approximately 150 persons "disappeared" during the country's military dictatorship period. The minister of defense had previously assured the public that the investigator would have free access to the archives. There were no further developments by year's end.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The constitution and laws prohibit such practices; however, there were several reports of torture by security forces.

On March 16, six police officers of the Special Tactical Crime Investigation Group in Cochabamba reportedly tortured Colombian citizen Mauricio Escobar Suarez whom they arrested for suspected involvement in weapons trafficking and robbery. The victim claimed that he was tortured by electric shocks and suffocation that resulted in what the victim claims was physical and mental torture. Both the Ombudsman's Office and the district attorney requested an official investigation into the police officers who participated in the arrest of the victim. However, the prosecutor assigned to the case rejected the claim of torture, stating that there were no grounds to support a charge. The Cochabamba Office for Professional Responsibility began disciplinary processes, but by year's end there was no update on criminal proceedings.

On April 17, Justo Romero Limon, an employee of a fishing and hunting store in Santa Cruz, alleged he was held and tortured for four hours by persons who he claimed were members of the BNP investigating a weapons-trafficking case. He stated that BNP officers covered him with a plastic bag and beat him while asking him where the weapons were located. The BNP refused to accept his formal complaints several days after the incident.

On July 6, BNP officers allegedly tortured David Olorio Apaza before he was killed in El Alto according to a report by the ombudsman (see section 1.a.).

There were no developments concerning allegations of abuse during the April 2009 arrest of Mario Tadic and Elod Toaso in connection with alleged terrorist activities or in the May 2009 claim of torture by Jhenieffer Wissemberg.

On September 25, national television broadcast videotapes from 2009 showing military trainers beating and apparently waterboarding conscripts, specifically conscript Guido Alvaro Lopez Cortez of Oruro. President Morales declared the allegations of torture as very serious and stated the perpetrators would be brought to justice. The ombudsman confirmed that said actions were torture. The accused military persons were suspended, but despite government pledges of cooperation, prosecutors in the case criticized the military's lack of responsiveness. The investigation continued at year's

end.

Two incidents of nonlethal mob violence were reported. On August 3, mobs attacked Potosi Governor Felix Gonzales with stones during a 19-day blockade and strike. In the same protest, mobs attacked the home of Vice Minister for Coordination with Social Movements Cesar Navarro before being dispersed by police. During the week of December 27, mob violence was reported in La Paz and El Alto in reaction to the December 26 government decree to remove gasoline subsidies. The protests ended after the government repealed the decree on December 31.

Following the 2009 mob invasion of his home, former vice president Victor Hugo Cardenas initiated criminal investigations against Alfredo Huanapaco, Cruz Alarcon, Beatriz Quispe, and Gonzalo Aduviri for not returning his home and property. The judge in the case has not yet given Cardenas permission to return to his house, and the trial was ongoing at year's end.

In May 2009 the pro-MAS Federation of Indigenous People of Eastern Bolivia (CIDOB) announced they had applied "community justice" to Beni Department Director of Indigenous Development Marcial Fabricano by publicly whipping him 50 times. CIDOB leader Adolfo Chavez stated that Fabricano was punished for not appointing MAS leaders to prominent positions in Beni. Fabricano opened a case against CIDOB leaders, and the government disavowed the attack and started a formal investigation. No results were announced by year's end.

Prison and Detention Center Conditions

Prison conditions were harsh. Prisons were overcrowded and in poor condition. Government authorities effectively controlled only the outer security perimeter of each prison. Prisoners usually maintained control, and gangs directed criminal activity from their cells.

Violence among prisoners, and in some cases the involvement of prison officials in violence against prisoners, were problems.

On November 25, in the maximum-security prison Chonchocoro La Paz, inmate Angel Fernando Mantilla Apaza, who had been declared a "dangerous" inmate by then director of Chonchocoro prison Hernan Ramirez Mendez, killed Peruvian national Junco Alberto Caceres by multiple gunshots. According to his relatives, Caceres was killed because he had threatened to disclose alleged links between police and robbers in the Olorio Apaza case (see section 1.a.). Research by the Ombudsman's Office revealed that the prisons did not transfer dangerous inmates, including Mantilla Apaza, as they had stated they would. An investigation was initiated into the prison system's role in the death of Ramirez Mendez and continued at year's end.

Corruption was a problem among low-ranking and poorly paid guards and prison wardens. Overcrowding and poor conditions in detention centers remained a problem. A prisoner's wealth often determined cell size, visiting privileges, day-pass eligibility, and place or length of confinement. Inmates reportedly paid fees to prior cell occupants or to prisoners who controlled cellblocks.

The standard prison diet was insufficient, and prisoners who could afford to do so supplemented rations by buying food.

The law provides that prisoners have access to medical care, but care was inadequate, and it was difficult for prisoners to get permission for outside medical treatment. NGOs and prisoners reported cases of tuberculosis and HIV/AIDS in jails. However, affluent prisoners could obtain transfers to preferred prisons or even to outside private institutional care for "medical" reasons. Inmates who could pay had access to drugs and alcohol, and sometimes they used children to traffic drugs inside the prisons. There were 8,300 inmates in facilities designed to hold 4,700 prisoners. There were separate prisons for women, except for Morros Blancos Prison in Tarija, where men and women shared facilities. Conditions for female inmates were similar to those for men; however, overcrowding at the San Sebastian women's prison in Cochabamba was worse than in most prisons for men.

According to Ministry of Government officials, 700 convicted juveniles (16 to 21 years old) were not segregated from adult prisoners in jails. According to interviews, adult inmates sometimes abused the juvenile prisoners. Rehabilitation programs for juveniles or other prisoners were scarce to nonexistent. Pretrial detainees were held with convicted prisoners.

Although the law permits children up to six years old to live with an incarcerated parent, children as old as 12 lived with their parents in prisons. (The law also permits spouses to live in prison.) Approximately 1,400 children lived with a parent in prison as an alternative to being left homeless. During school vacations the number of children in prison with parents sometimes doubled.

Prison detainees had reasonable access to visitors and were permitted religious observance. Authorities permitted prisoners to submit complaints periodically to a commission of district judges, which then investigate; however, many complaints of abuses are not submitted because inmates were afraid of prison retaliation.

The government generally permitted prison visits by independent human rights observers, judges, and media

representatives, and such visits took place during the year.

d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention; however, in one case security forces seized and held an individual under legally questionable circumstances.

On March 10, police arrested and temporarily detained Eduardo Paz, president of the Santa Cruz Chamber of Industry, Trade, Services, and Tourism, for alleged connection to the 2009 terrorism case in Santa Cruz. There was no warrant or arraignment order against him, nor was there a subpoena for him to testify. There were no subsequent developments in this case.

Jorge Melgar Quete remained in a La Paz jail awaiting trial after his 2008 arrest for publicly calling for the "liquidation" of President Morales. The opposition maintained Melgar was jailed for disseminating video of Presidency Minister Quintana calling for the "political burial" of then Pando prefect Leopoldo Fernandez.

Role of the Police and Security Apparatus

The national police have primary responsibility for internal security, but military forces may be called upon for help in critical situations. The national police disciplined officers by issuing 826 administrative sanctions and arrested 281 police officers, suspending them from duty. Prosecutors were sometimes reluctant to prosecute security officials for alleged offenses committed while on duty, in part because they relied on the Judicial Technical Police to investigate its own officers. NGOs charged that several investigations into potential human rights violations by the military stalled or proceeded slowly due to an administrative policy prohibiting the military from commenting on its activities, a policy that can be overruled by civilian judges.

During the year the government provided in-depth human rights training to 3,129 police officers.

Arrest Procedures and Treatment While in Detention

Arrests were generally carried out openly, but there were credible reports of arbitrary arrests and detentions.

The law requires an arrest warrant, and police must inform the prosecutor of an arrest within eight hours. The law requires that a detainee see a judge within 24 hours (except under a declared state of siege, in which a detainee may be held for 48 hours), at which time the judge must determine the appropriateness of continued pretrial detention or release on bail. The judge must order the detainee's release if the prosecutor fails to show sufficient grounds for arrest. Credible reports indicated that in some cases detainees were held for more than 24 hours without court approval.

More than 75 percent of detainees awaited sentencing, but the courts provided release on bail for some detainees. Judges have the authority to order preventive detention for suspects deemed a flight risk. If a suspect is not detained, a judge may order significant restrictions on the suspect's movements. Detainees generally had prompt access to their families and were allowed access to lawyers, but approximately 70 percent could not afford legal counsel, and public defenders were scarce and overburdened.

Denial of justice through prolonged detention remained a problem. Although the law establishes that a case's investigatory phase cannot exceed a maximum of 18 months and that the trial phase cannot exceed three years, some suspects were held in preventive detention longer than the legal limits. If the investigatory process is not completed in 18 months, the detainee may request release by a judge; however, judicial corruption, a shortage of public defenders, inadequate case-tracking mechanisms, and complex criminal justice procedures kept some persons jailed for more than 18 months before trial.

Children from 11 to 16 years of age may be detained indefinitely in children's centers for known or suspected offenses, or for their protection, on the orders of a social worker. There is no judicial review of such orders.

e. Denial of Fair Public Trial

The law provides for an independent judiciary, but the judiciary was widely considered corrupt, overburdened, and weakened by vacancies at its highest levels.

On June 9, Amnesty International characterized the justice system as beset by "the pervasive culture of impunity and the widespread lack of trust in the justice system," while a representative of the Office of the UNHCHR expressed concerns about the politicization of the judicial process.

The constitution states that high-level court judges should be elected by national elections. However, a controversial "short law" allowed President Morales to appoint 18 judges to vacancies on the Supreme Court, Constitutional Tribunal, and Judicial Council. The appointments continue until judicial elections (scheduled for April or May 2011) are held. Critics

asserted that the interim arrangement compromised the judiciary's independence.

The Supreme Court faced a backlog of more than 8,000 pending requests, some dating back to 2003. According to former president of the Supreme Court Julio Ortiz, during the year the court settled 1,600 cases. The Supreme Court had only one vacancy compared with 2009 when five of the 12 positions were vacant.

President Morales also filled all the vacancies on the Constitutional Tribunal, which had not functioned for almost a year.

The Judicial Council, a legal oversight body created to fight corruption and malpractice by judges, had a backlog of more than 100 disciplinary cases. The military justice system generally was susceptible to senior-level influence and tended to avoid rulings that would embarrass the military. When a military member is accused of a crime related to his military service, the commander of the affected unit assigns an officer to conduct an inquiry and prepare a report. The results are forwarded to a judicial advisor, usually at the division level, who then recommends a finding of innocence or guilt. For major infractions the case is forwarded to a military court, except that military personnel are supposed to be tried in civilian courts for human rights violations.

Trial Procedures

Defendants have constitutional rights to a presumption of innocence, to a speedy and public trial by jury, to remain silent, to have an attorney, to confront witnesses, to present evidence on their own behalf, to due process, to appeal, and to confront legal charges with government prosecutors before a formal court process is initiated.

In practice the rights to an attorney and to a speedy trial were not protected systematically. According to the Public Defender's Office, its staffing for the country's nine departments included only 55 public defenders and 11 legal assistants. A study by the Inter-American Commission on Human Rights (IACHR) released in December 2009, indicated that only 55 percent of municipalities had judges, 23 percent government investigators, and 3 percent public defenders.

The law provides for a system of transparent oral trials in criminal cases, requires that no pretrial detention exceed 18 months without charges, provides for a maximum period of detention of 24 months in cases in which a sentence is being appealed, and mandates a three-year maximum duration for a trial. The law provides that the prosecutor is in charge of the investigative stage of a case and that he must give suspects an opportunity to confront charges before a trial formally begins. However, the law was unevenly applied, and there were delays.

The prosecutor instructs police regarding witness statements and evidence necessary to prosecute. The prosecutor pursues misdemeanor cases (with possible sentences of less than four years) before a sentencing judge and felony cases (with possible sentences of more than four years) before sentencing courts. Sentencing courts feature a five-member panel of three citizens and two judges.

Political Prisoners and Detainees

Unlike last year, there were no reports of political prisoners or detainees. In 2009 the opposition alleged that former Pando prefect Leopoldo Fernandez and three others were held as political prisoners, while the government maintained they were being held legally under judicial order (see section 1.d.) The government allowed Fernandez to receive visitors, including international monitors, but did not allow press to enter the prison to interview Fernandez as part of his national election campaign. The UNHCHR continued to monitor this case at year's end.

Civil Judicial Procedures and Remedies

There is an independent and impartial judiciary for civil matters. The law provides criminal remedies for human rights violations, and at the conclusion of a criminal trial, the complainant can initiate a civil trial to seek damages. Administratively, the ombudsman for human rights can issue resolutions on specific human rights cases, which the government may enforce.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions, and the government generally respected these prohibitions.

In connection with the May 8 killing of two youths in La Paz Department, authorities twice raided the homes of the victims' lawyers, Jorge Quiroz and Claudia Lecona, after they filed suit against National Police Commander Oscar Nina and Government Minister Sacha Llorenti. According to the ombudsman's report, these raids violated the lawyers' human rights. The investigation continued at year's end.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press. Although the government generally respected these rights, it maintained an antagonistic relationship with the press. In one example, on November 25, President Morales stated in response to a journalist's question, "the largest and the greatest opposition [to this government] are the journalists. Who can deny that? Can you deny this? The greatest opposition, in reality, is the media, the owners of the media, and how they use our friends the journalists." Opposition members charged President Morales and government officials with making disparaging statements regarding the press, politicizing state-produced media content, and taking actions designed to restrict independent media or to encourage self-censorship.

There were multiple independent media outlets, including printed press, television, and radio, and the airing of various viewpoints, many expressing opposition to the government, continued. Radio and television stations generally operated freely. However, in rural areas state radio was often the only available media source.

The law provides that persons found guilty of insulting, defaming, or slandering public officials for carrying out their duties may be jailed from one month to two years. Insults directed against the president, vice president, or a minister increase the sentence by half. Journalists accused of violating the constitution or citizens' rights are referred to the 40-person Press Tribunal, an independent body authorized to evaluate journalists' practices and to apply sanctions.

In its 2010 *Freedom of the Press* report, the NGO Freedom House characterized the country's press as "partly free." Freedom House reported "significant slides continued" in the country "as attacks and official rhetoric against the media escalated."

On October 8, President Morales signed into law "the Law against Racism and All Forms of Discrimination." While expressing their support for the general principles of the law, journalists, media groups, and the Catholic Church criticized two specific articles that would sanction media outlets that broadcast or print racist or discriminatory content. Media organizations held large protests and collected signatures calling for the articles in question to be removed. They claimed the sanctions could be applied selectively to restrict freedom of the press. Addressing the debate over the law, UN High Commissioner for Human Rights Navi Pillay stated during a visit in November that "international law requires that the limitations (to freedom of expression) be stipulated by law, be defined in a clear and precise way, and be implemented by an independent entity."

On September 20, the offices of Radio Virtual 94.7 were damaged by a fire that consumed much of their office and equipment. The police continued to investigate this case, and the cause of the fire had yet to be determined at year's end.

In March 2009 the government sued the leading daily newspaper, *La Prensa*, for slander for publishing a story linking President Morales and Presidency Minister Juan Ramon Quintana to a plan to smuggle 33 truckloads of contraband into Brazil. *La Prensa* editors rejected the claim and said they considered the trial an attempt to silence the press. The case had not been resolved at year's end.

According to data from local NGO Unir's National Media Observatory, there were 60 reported cases of aggression (physical and verbal attacks and threats) affecting 111 journalists.

In addition to the Anti-Racism Law, media organizations expressed concern over other legislation that they argued would restrict press freedom. They charged that the new Electoral Regime Law prohibited the media from discussing, in any way, candidates standing for election to Supreme Court and Constitutional Tribunal.

Internet Freedom

There were no government restrictions on access to the Internet or reports that the government monitored e-mail or Internet chat rooms. Individuals and groups could engage in the peaceful expression of views via the Internet, including by e-mail. The International Telecommunication Union reported that in 2009 there were 11 Internet users per 100 inhabitants.

Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of peaceful assembly, and authorities generally respected this right in practice. While the law requires a permit for most demonstrations, security forces rarely enforced the law, and most protesters demonstrated without obtaining permits, frequently blockading major thoroughfares and highways.

While most demonstrations were peaceful, occasionally demonstrators carried weapons, including clubs, machetes, firearms, and dynamite. Security forces (police and occasionally the military) were frequently called upon to break up protest groups carrying weapons or threatening government and private facilities.

Freedom of Association

The law provides for freedom of association, and the government generally respected this right in practice.

c. Freedom of Religion

For a complete description of religious freedom, please see the *2010 International Religious Freedom Report* at www.state.gov/g/drl/irf/rpt/.

d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The law provides for freedom of movement within the country, foreign travel, emigration, and repatriation, and the government generally respected these rights in practice. However, throughout the year both progovernment and opposition protesters as well as trade and industry groups prevented movement within the country by blockading major highways.

The law prohibits the forced exile of citizens, and the government did not employ the practice.

Protection of Refugees

The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees. In practice the government provided some protection against the expulsion or return of refugees to countries where their lives or freedom would be threatened on account of their race, religion, nationality, membership in a particular social group, or political opinion.

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, asylum seekers, stateless persons, and other persons of concern. The UNHCR reported that the recognized refugee population in the country was 737 persons, compared with 673 persons in 2009. The government completed processing and agreed to provide refugee protection in 28 cases and denied refugee status to 13 cases. There were 46 new applications during the year.

Several hundred thousand citizens lacked basic identity documents, which prevented them from obtaining international travel documents and accessing other government services. Some experts estimated the number of citizens lacking documents had decreased due to government efforts.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens the right to change their government peacefully, and citizens exercised this right through periodic, free, and fair elections based on universal suffrage. Many citizens of voting age, particularly in rural areas, lacked the identity documents necessary to vote. A broad spectrum of political parties and citizens' groups functioned openly. Elections for national offices and municipal governments are scheduled every five years.

Elections and Political Participation

Monitoring groups, including the Carter Center and the EU, proclaimed the April 4 gubernatorial and municipal elections peaceful, free, and fair. There were some allegations of fraud in the departments of Beni, Pando, Tarija, and Santa Cruz that led the electoral courts to invalidate some votes from polling stations in which fraud and irregularities were confirmed. Voters enrolled at these stations were called to recast their votes on April 18. President Morales and MAS members publicly denounced those election results as fraud-marred and initiated lawsuits against the four departmental electoral courts.

Monitoring groups from the Organization of American States, the EU, and the Carter Center considered the December 2009 national presidential and legislative elections peaceful, free, and fair. Implementation of a new biometric electoral register greatly reduced accusations of fraud. There were no reports of significant violence.

Every second candidate on municipal election ballots must be a woman, a requirement that had increased female representation to approximately 30 percent of municipal council positions. There were 52 women among Congress' 166 deputies and senators and 10 women in the 18-member cabinet. The number of indigenous members of Congress was estimated at 17 percent.

The constitution and electoral law set aside seven special indigenous districts to increase indigenous political participation in the Plurinational Assembly (Congress). President Morales considered himself indigenous. Three of the nine departmental governors were indigenous.

Section 4 Official Corruption and Government Transparency

The law provides criminal penalties for official corruption; however, the government did not implement the law effectively, and officials in the executive, legislative, and judicial branches of government often engaged in corrupt practices with impunity. Laws to combat corruption and promote transparency include the Financial Administration and Control Law, the State Employees Statute Act, and the Sworn Declaration of Property and Income Law. A cabinet-level presidential appointee is empowered to investigate corruption at any level in any branch of government.

According to the World Bank's 2009 worldwide governance indicators, government corruption and lack of transparency were serious and worsening problems.

Police corruption was a significant problem, partially due to low salaries and lack of training, although no reliable statistics existed to quantify the depth of the problem.

In August the criminal court in La Paz put former vice minister of interior Gustavo Torrico under house arrest after an announcement by Presidency Minister Oscar Coca that Torrico was involved in extortion of Mennonite citizens in Santa Cruz. German citizen Dirk Schmidt, who helped create the network intended to extort money, was sentenced to prison for his involvement in the case.

In September former president Jorge "Tuto" Quiroga was sentenced to two years and eight months in prison for slander and defamation for statements he made in February 2009 alleging corruption in a bank. Quiroga claims the sentencing is politically motivated and has filed an appeal.

There were no developments in the January 2009 case of the killing of an oil executive and robbery of briefcases believed to be linked to a corruption scandal involving the state petroleum company.

There were no developments in the April 2009 case regarding the purchase of land in Santa Cruz for mining purposes. The case centered on allegations that government officials profited illegally from the sale.

A patchwork of laws requires public officials to report potential personal and financial conflicts of interest. Cases involving allegations of corruption against public officials require congressional approval before prosecutors can initiate legal proceedings.

There were no laws providing access to government information.

Section 5 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A number of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials generally were cooperative and responsive to their views; however, NGOs and the human rights ombudsman complained that government security forces and ministries occasionally refused to cooperate with their investigations.

The human rights ombudsperson is a position with a six-year term established in the constitution. Congress chooses the ombudsperson by a two-thirds majority vote. The ombudsman is charged with providing oversight of the defense and promotion of human rights, specifically to defend citizens against government abuses. The ombudsman operated without party influence and with adequate resources from the government and foreign NGOs. The ombudsman issued annual reports, and the government usually accepted the recommendations. In May, Congress elected Rolando Villena Villegas as the new ombudsman. Villena then named new departmental ombudspersons. The lower house of congress includes a permanent commission on human rights, which proposes laws and policies to promote human rights. Congressional deputies sit on the commission for one-year terms.

In August and September, Villena released reports criticizing the government's role in the deaths of two youths in Caranavi and in what the office reported as the torture and death of David Olorio Apaza (see section 1.a.). Villena also released an end-of-year report that was critical of the government and the speed of the judicial process.

In the aftermath of the April 2009 killing of three alleged international terrorists in Santa Cruz (see section 1.a.), President Morales initially rejected calls by the governments of Hungary, Ireland, and Croatia for an international investigation but subsequently authorized police to cooperate with investigators from the three countries. An investigation by the Irish government concluded that the postmortem on one of the alleged terrorists, Michael Dwyer, was incomplete. There were no new developments by year's end.

Section 6 Discrimination, Societal Abuses, and Trafficking in Persons

The constitution explicitly prohibits discrimination based on race, gender, language, sexual orientation, or social status. According to the human rights ombudsperson, there was significant discrimination against (in descending order) persons with HIV/AIDS, indigenous persons, gay persons, and women.

Women

Rape was a serious and underreported problem. . The law criminalizes statutory rape, with prison terms of 15 to 20 years for the rape of a child under the age of 14. In cases involving consensual sex with an adolescent 14 to 18 years of age, the penalty is two to six years' imprisonment. Forcible rape of an adult is punishable by sentences ranging from four to 10 years' imprisonment. . Spousal rape is not a crime.

Violence against women was also a pervasive and underreported problem. According to the NGO Center for the Information and Development of Women (CIDEM), 70 percent of women suffered some form of abuse. CIDEM noted that the statistics "did not reflect the full magnitude of the problem of violence against women" and that "a great number of women" did not report the aggression they faced on a daily basis.

Family laws prohibiting mental, physical, and sexual violence provide for fines or up to four days in jail, unless the case becomes a public crime subject to the penal code; however, these laws were enforced irregularly. The government took few meaningful or concrete steps to combat domestic violence.

Through November, the police Family Protection Brigade handled 70,792 cases nationally. However, the police brigade lacked financial support, structural support, and personnel to follow up and pursue all reported cases. Most cases of domestic violence went unreported.

The law considers sexual harassment a civil crime. There were no statistics on the incidence of sexual harassment, but it generally was acknowledged to be widespread.

Legal services offices devoted to family and women's rights operated throughout the country. The Maternal and Infant Health Insurance Program provided health services to women of reproductive age and to children under age five.

The government recognized the basic right of couples and individuals to decide freely and responsibly the number, spacing, and timing of their children. Health clinics and local health NGOs were permitted to operate freely in disseminating information on family planning under the guidance of the Ministry of Public Health. The government provided direct cash transfers to expecting and new mothers to encourage the use of basic public health services that contribute to reducing maternal and infant mortality. According to the 2008 Demographic and Health Survey, the maternal mortality ratio was estimated to be 310 per 100,000 live births, and the reported contraceptive prevalence rate among women was 61 percent; however, only 37 percent of women using contraceptives used modern methods.

The 2008 Demographic and Health Survey reported that 90 and 71 percent of women received prenatal care and services of skilled birth attendants, respectively. The survey reported that 85 percent of mothers and infants received postnatal care. Improvement in these indicators were explained by the Ministry of Public Health policy of providing cash in the form of bonuses to women that register at a health center and return for their prenatal visits, delivery, and postpartum care.

Women are entitled to the same legal rights as men; however, many women were unaware of their legal rights. Women generally did not enjoy a social status equal to that of men. Traditional prejudices and social conditions remained obstacles to advancement. In rural areas traditional practices restricting land inheritance for women remained a problem. The minimum wage law treats men and women equally; however, women generally earned less than men for equal work. Women sometimes complained that employers were reluctant to hire them because of the additional costs (mainly maternal) in a woman's benefits package. The gender gap in hiring appeared widest in the higher education brackets. Most women in urban areas worked in the informal economy and the services and trade sectors, including domestic service and microbusiness, whereas in rural areas the majority of economically active women worked in agriculture. Young girls often left school early to work at home or in the informal economy.

Numerous domestic and international women's rights groups worked to advance women's rights and integrate women into the mainstream of society.

Children

Citizenship is derived through both birth within the country's territory (unless on diplomatic status) and from one's Bolivian parent(s). Birth certificates were registered either via a notary's affirmation of the certificate or through testimony of two adults regarding a child's parentage. Registered birth certificates were necessary to obtain national identification cards.

Corporal punishment and verbal abuse were common in schools. Children from 11 to 16 years of age may be detained indefinitely in children's centers for suspected offenses or for their own protection on the orders of a social worker. Many children also lived on the streets of major cities. The United Nations Children's Fund (UNICEF) estimated in 2007 that more than 3,700 children and adolescents lived on the streets in the cities of La Paz, El Alto, Santa Cruz, Cochabamba, Tarija, and Sucre. Child prostitution was a problem, particularly in urban areas and in the Chapare region. There were reports of children trafficked for forced labor to neighboring countries. According to a report by Pastoral de Movilidad Humana in 2008, the local representative of the UNHCR, each month between nine and 11 children in the southern part of the country disappeared and were presumed victims of trafficking. Several NGOs had active programs to combat child

prostitution.

There were 194 Defender of Children and Adolescents offices to protect children's rights and interests nationwide. The government's plan to combat child labor included a public information campaign against child prostitution and raids on brothels.

The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. For information on international parental child abduction, please see the Department of State's annual report on compliance at http://travel.state.gov/abduction/resources/congressreport/congressreport_4308.html.

Anti-Semitism

There were no reports of anti-Semitic acts. The Jewish community numbered approximately 650 persons.

Trafficking in Persons

For information on trafficking in persons, please see the Department of State's annual *Trafficking in Persons Report* at www.state.gov/g/tip.

Persons with Disabilities

The law prohibits discrimination against persons with disabilities and identifies the rights and benefits afforded them. There was no official discrimination against persons with disabilities in employment, education, access to health care, or the provision of other state services. The government did not effectively enforce these provisions, however, and societal discrimination kept many persons with disabilities at home from an early age, limiting their integration into society. The Law on Disabilities requires wheelchair access to all public and private buildings, duty-free import of orthopedic devices, a 50 percent reduction in public transportation fares, and expanded teaching of sign language and Braille.

The National Committee for Handicapped Persons was responsible for protecting the rights of persons with disabilities.

National/Racial/Ethnic Minorities

In October the government enacted a new Anti-Racism Law making it illegal to discriminate or use racist language (see section 2.a.). This law includes punishments of up to a 360-day suspension of media outlets for use of alleged racist language. It also includes a mandate for all forms of media to highlight antiracism programming or literature in their shows and publications. There was societal and systemic discrimination against the small black minority, which generally remained at the low end of the socioeconomic scale and faced severe disadvantages in health, life expectancy, education, income, literacy, and employment. The majority of the estimated 35,000 Afro-Bolivians lived in the Yungas region of La Paz Department.

Indigenous People

In the 2001 census, approximately 62 percent of the population over 15 years of age identified themselves as indigenous, primarily from the Quechua and Aymara groups. The IACHR reported that 70 percent of indigenous persons lived in poverty or extreme poverty with little access to education or minimal services to support human health such as clean drinking water and sanitation systems. The government carried out a wide-ranging program to increase access to potable water and sanitation in rural areas where indigenous persons predominated.

Indigenous lands are not demarcated fully, and land reform remained a central political issue. Historically, a majority of indigenous persons shared lands collectively under the "ayllu" system, a system that was not legally recognized during the transition to private property laws. Despite laws mandating reallocation and titling of lands, recognition and demarcation of indigenous lands have not been fully accomplished. Indigenous people protested outside exploitation of their resources and sometimes complained that authorities did not properly consult them. The law states that indigenous peoples have the right to control natural resources in their territories.

Indigenous peasants occupied several private properties that they did not own, often with the backing of the Landless Movement. Since 2007 at least eight illegal seizures of mines by campesinos have been reported. In August campesinos seized Potosi mines during the 19-day blockade and strikes within the region. On August 16, the federal government met with the leaders of the strike and agreed to several of their requests to end the blockade and strikes, including: a commission to address a disputed border with neighboring Oruro; a commission to study the use and preservation of the Cerro Rico mountain in Potosi city; a declaration to construct an international airport; pledges to construct cement factories; and extended state control over the Karachipampa smelter upon completion of arbitration with Atlas Precious Metals Company. At year's end there were no further developments.

Indigenous persons continued to be underrepresented in government and politics and bore a disproportionate share of poverty and unemployment. Government educational and health services remained unavailable to many indigenous

groups living in remote areas. The government continued to try to improve individual and family situations through the delivery of cash conditional transfer (money given to individuals if they meet a condition) and retirement payments to low-income and the elderly. For example, under the cash conditional transfer program, pregnant women and children under the age of two receive money if they attend their medical checkups (an attempt to decrease infant mortality).

Societal Abuses, Discrimination, and Acts of Violence Based on Sexual Orientation and Gender Identity

The law prohibits discrimination based on sexual orientation, including by police, and citizens are allowed to change their name and gender on their official identity cards. However, societal discrimination against gay, lesbian, bisexual, and transgendered persons was common and noted in local media editorials. Organizations advocating for gay, lesbian, bisexual, and transgender persons existed and marches occurred, including a small annual gay pride parade, which received appropriate government approval and police protection. One student was reportedly expelled from high school for being gay, although school authorities denied that was the reason for the expulsion.

Other Societal Violence or Discrimination

The human rights ombudsman reported that persons with HIV/AIDS faced pervasive discrimination. There were few if any registered acts of violence against persons with HIV/AIDS. No formal government programs existed to combat HIV/AIDS discrimination.

Section 7 Worker Rights

a. The Right of Association

**THE LAW ALLOWS WORKERS TO FORM AND JOIN TRADE UNIONS, INCLUDING IN THE PUBLIC SECTOR, WITH SOME EXCEPTIONS. IN PRACTICE THIS RIGHT WAS LIMITED BY GOVERNMENT REGULATIONS AND INEFFICIENT LABOR COURTS.**

**THE LAW REQUIRES PRIOR GOVERNMENT AUTHORIZATION TO ESTABLISH A UNION AND CONFIRM ITS ELECTED LEADERSHIP, PERMITS ONLY ONE UNION PER ENTERPRISE, AND ALLOWS THE GOVERNMENT TO DISSOLVE UNIONS BY ADMINISTRATIVE FIAT. THE LAW ALSO PLACES RESTRICTIONS ON UNIONS' INTERNAL AFFAIRS. FOR EXAMPLE, MEMBERS OF UNION EXECUTIVE BOARDS MUST BE BOLIVIAN BY BIRTH, AND LABOR INSPECTORS ARE ALLOWED TO ATTEND UNION MEETINGS AND TO MONITOR UNION ACTIVITIES.**

Workers may form a union in any private company of 20 or more employees with at least 50 percent of the workforce in favor. The minimum requirement of 20 workers proved a heavy restriction, as an estimated 72 percent of enterprises had fewer than 20 employees. Approximately 25 percent of workers in the formal economy, which employed an estimated 30 percent of all workers, belonged to unions. Bolivian unions may not join international organizations.

The law provides most workers with the right to strike but requires unions to seek prior government mediation; the law requires the same of employers before they initiate a lockout. According to the law, a legal strike requires the support of 75 percent of the workers. Workers who participate in an unlawful strike may be sentenced to prison terms of one to five years.

The government may initiate compulsory arbitration to end a strike or collective dispute in non-essential sectors. Public service employees, including those in banks and public markets, are prohibited from striking which exceeds the International Labor Organization (ILO) definition of essential services.

Workers in the public sector (including teachers, transportation workers, and health care workers) frequently went on strike and were not penalized for such strike activities. General and solidarity strikes are illegal, but the government neither prosecuted nor imposed penalties in such cases.

The central government had close ties with certain umbrella labor organizations such as the Bolivian Workers' Union and the Confederation of Farm Workers. The government exerted pressure on national leadership and local chapters of many of these organizations and funded parallel chapters in areas where the government had less influence.

b. The Right to Organize and Bargain Collectively

The law provides workers the right to organize and bargain collectively; however, collective bargaining and voluntary direct negotiations between employers and workers without government participation was limited. Most collective bargaining agreements were restricted to addressing wages.

The law prohibits antiunion discrimination and requires reinstatement of employees illegally fired for engaging in union activity. The National Labor Court handles complaints of antiunion discrimination, but rulings can take a year or more. The

court ruled in favor of discharged workers in some cases and successfully required their reinstatement. However, union leaders stated that problems often were resolved or obsolete by the time the court ruled.

There are no special laws or exemptions from regular labor laws in special duty-free zones.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced or compulsory labor, including by children; however, the practices of child apprenticeship and agricultural servitude by indigenous workers continued, as did some alleged individual cases of household workers effectively held captive by their employers.

In many cases indigenous Guarani families worked land owned by landlords in exchange for housing and food but were not paid the minimum wage. As a result they incurred large debts to their landlords and were not permitted to leave the property without satisfying their debt. Many of these families lived in very poor conditions without water, electricity, medical care, or schools.

Some workers, mostly indigenous persons, were forced to work harvesting Brazil nuts in Beni Department. The work was seasonal, lasting approximately three months per year. During that time landlords sold basic foodstuffs to workers at inflated prices; workers subsequently incurred large debts and were not permitted to leave the property until the debts were satisfied. Similar conditions existed in the sugar, cattle, corn, and peanut industries in Santa Cruz Department.

d. Prohibition of Child Labor and Minimum Age for Employment

Child labor remained a serious problem. The law prohibits all paid work by children under the age of 14; however, in practice the Ministry of Labor generally did not enforce child labor laws, including those pertaining to the minimum age and maximum hours for child workers, school completion requirements, and health and safety conditions for children in the workplace. The law prohibits a range of dangerous, immoral, and unhealthy work for minors under the age of 18. Labor law permits apprenticeship for 12- to 14-year-old children under various formal but poorly enforced restrictions which have been criticized by the ILO and were considered by some to be tantamount to bondage.

The Ministry of Labor is responsible for enforcing child labor provisions but enforced them unevenly throughout the country. According to the ILO, 848,000 children between the ages of five to 17 worked. Roughly 800,000 children were under the age of 14 years and were working in risky labor conditions ,354,000 in urban areas and 446,000 in rural areas.

There was also evidence of exploitation of indigenous children in the Chaco region, the departments of Beni and Santa Cruz, and in cities across the country wherever individuals were migrating from the countryside. Urban children sold goods, shined shoes, and assisted transport operators. Rural children often worked with parents from an early age, generally in subsistence agriculture. Children generally were not employed in factories or formal businesses but, when employed, often worked the same hours as adults. Children also worked in mining gold, silver, tin, and zinc, as well as in other dangerous occupations in the informal sector.

Child prostitution remained a problem. According to the human rights ombudsman, 3,000 children lived in the streets, and many were exploited sexually. The report stated that more than 100,000 children worked eight to 12 hours a day. The International Organization for Migration estimated that 2,000 girls worked, or were forced to work, as prostitutes.

The traditional practice of "criadito" service persisted in some parts of the country. Criaditos are indigenous children of both sexes, usually 10- to 12-year-olds, whom their parents indenture to middle-and upper-class families to perform household work in exchange for education, clothing, room, and board. Such work is illegal, and there were no controls over the benefits to, or treatment of, such children.

In addition significant numbers of children faced forced-labor situations in the production of sugarcane and Brazil nuts, mining, agriculture, and domestic service. See also the Department of State's annual *Trafficking in Persons Report* at www.state.gov/g/tip.

The government devoted limited resources to investigating child labor cases, but NGOs and international organizations such as UNICEF supplemented the government's efforts. The government continued its efforts to eliminate child labor in its worst forms, working with NGOs to discourage the use of child labor in the mining and sugar sectors by participating in internationally funded programs to provide educational alternatives to children who otherwise would work in mines or sugarcane fields. Nonetheless, according to the human rights ombudsman in 2009, 3,800 children worked in mining.

e. Acceptable Conditions of Work

During the year the government raised the minimum monthly wage 5 percent to 680 bolivianos ($97) for the public and private sectors, from 647 bolivianos ($92) in 2009. The minimum wage did not provide a decent standard of living for a worker and family. Most private-sector workers earned more than the minimum wage. While the minimum wage fell below prevailing wages in most jobs, certain benefit calculations were pegged to it. Many independent workers were part of the

informal economy and did not receive the minimum wage.

Labor laws establish a maximum workweek of 48 hours, limit women to a workday one hour shorter than that of men, prohibit women from working at night, mandate rest periods, and require premium pay for work above a standard workweek. In practice the government did not effectively enforce these laws.

The Ministry of Labor's Bureau of Occupational Safety has responsibility for protection of workers' health and safety, but relevant standards were poorly enforced. There were fewer than 37 inspectors in the entire country. While the government did not maintain official statistics, there were reports that workers died due to unsafe conditions, particularly in the mining and construction sectors. A national tripartite committee of business, labor, and government representatives was responsible for monitoring and improving occupational safety and health standards. The Ministry of Labor maintained an office for worker inquiries, complaints, and reports of unfair labor practices and unsafe working conditions.

Working conditions in cooperative-operated mines remained poor. Miners continued to work with no scheduled rest for long periods in dangerous, unhealthy conditions and earned relatively little for their efforts; some earned only seven bolivianos ($1) per hour. Conditions have changed little in the past decades, as independent miners' cooperatives lacked the financial and technical resources needed to improve mine infrastructure. The law provides workers the right to remove themselves from dangerous situations without fear of losing their jobs. Since most miners in these conditions are self-employed, they leave mine work when prices are lower, often to work in the Chapare as coca growers. However, few have transferrable skills. Miners return to work in the mines when prices are high and they can earn higher wages.

**Back to Top**

The Office of Electronic Information, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.